James Lee HARPER, Plaintiff,

v.

W. Michael BLUMENTHAL et al., Defendants.

Civ. A. No. 76–2332.

United States District Court, District of Columbia.

July 31, 1979.

Michael F. Zeldin, Community Legal Clinic, Washington, D. C., for plaintiff.

David H. Shapiro, Asst. U. S. Atty., Washington, D. C., for defendants.

OPINION

SIRICA, District Judge.

This case is before the Court on the defendants' motion to dismiss or, in the alternative, for summary judgment. Because affidavits and exhibits extraneous to the pleadings have been submitted, the Court will treat the motion as one for summary judgment, as provided in Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Plaintiff, a probationary employee, complains that he was wrongfully dismissed from his position as a bulk money handler in the Coin Branch of the Department of the Treasury. He seeks reinstatement, back pay, damages, a declaratory judgment, and other equitable relief.

Because the Civil Service laws provide probationary employees in plaintiff's circumstances with no effective avenues of relief, he finds his cause of action in the first and fifth amendments to the United States Constitution. He alleges that he was dismissed for criticizing his supervisor's conduct of Coin Branch affairs, in violation of his first amendment right to freedom of speech. In addition, he charges that defendants violated his fifth amendment due process rights by failing to provide him a hearing to contest the stated reasons for his dismissal.

Defendants maintain that the undisputed facts establish that plaintiff was dismissed for his unsatisfactory work and disruptive conduct, not for his exercise of his first amendment rights. While conceding that he was denied a hearing to contest the misconduct charges, they argue as a matter of law that the fifth amendment required no such hearing in this case.

The Court has concluded that, viewing all inferences to be drawn from the facts as alleged in the light most favorable to plaintiff, *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), defendants' motion must be denied.

*Facts*[1]

Plaintiff began work on June 22, 1975, in the Coin Branch, Bureau of Government Financial Operations, Department of the Treasury, as a GS–3 bulk money handler. The duties of a bulk money handler included: safeguarding coin in transit; weighing and tagging coin bags; stacking coin bags in Treasury vaults; distributing coin bags to coin-counting-machine operators; occasionally assisting such operators; and filling orders for coins.

Plaintiff's immediate supervisor was defendant Melvin A. Bruce, manager of the Coin Branch, who oversaw the activities of the money handlers and coin-counting-machine operators. In September 1975 Bruce was notified by a Mr. Gabourel, Director of the Currency Claims Division, that $100 had been found missing from a bag of coins. The money handlers were singled out as possible suspects based on the ostensible flow of work through the shop. Consequently, plaintiff and three other money handlers were called to a meeting with Gabourel to discuss the shortage.

During that meeting plaintiff suggested that the coin-sorting-machine operators should be questioned as well as the money handlers, since they regularly violated established money flow procedures, with defendant Bruce's knowledge and approval. Plaintiff explained that in order to raise production figures for the department and qualify themselves (and their superiors) for year-end bonuses, the machine operators would bypass the sorting equipment, sending bags of unsorted coins through as if sorted. Thus, he concluded, any deductions based on the established work flow procedures would be faulty unless these irregularities were included in the equation.

Gabourel subsequently called Bruce into his office and confronted him with plaintiff's allegations. Thereafter plaintiff's relations with Bruce deteriorated.

In late November 1975 Bruce transmitted a memorandum to an Employee Relations

---

1. For the purposes of this motion, the facts and inferences therefrom are stated in the light most favorable to plaintiff and, as a consequence, are drawn largely from plaintiff's statement of facts.

Specialist alleging that plaintiff failed to carry out assigned duties, used disrespectful language, and made threats to supervisors and fellow employees. On December 1, 1975, defendant Rudy Villarreal, Director of the Division of Cash Services, notified plaintiff that he would be dismissed on December 12.

Prior to that date, plaintiff alleges, Villarreal offered him the opportunity to resign, representing that if he did his personnel record would not show that the department intended to dismiss him or contain the allegations of misconduct. Plaintiff resigned on December 10. Nevertheless, the December 1 termination letter containing the allegations of misconduct and Bruce's November memorandum were retained in plaintiff's personnel file.

The Standard Form 50, documenting plaintiff's resignation, included the following comments under the heading "Remarks":

> Resigned after receiving written notice proposing to separate for failure to carry out assigned duties, disrespectful language, and threats of physical harm.
>
> .    .    .    .    .
>
> Employee reason: I was given the option to resign or I would be terminated.

Plaintiff requested both the Department of the Treasury and the Civil Service Commission[2] to grant him a hearing to contest the reasons stated for his dismissal, but his request was not granted.

From the time of his dismissal until this action was filed on December 21, 1976, plaintiff was unable to find a job. He alleges that numerous applications to federal offices were unsuccessful because of the allegations contained in his personnel file.

On January 19, 1977, the U.S. Civil Service Commission, Bureau of Personnel Investigations, found that plaintiff did not meet the suitability requirements for employment in the competitive service under 5 C.F.R. § 731.201. This decision was founded on plaintiff's alleged misconduct while employed at the Treasury.

Plaintiff successfully appealed to the Federal Employee Appeals Authority, which reversed the unsuitability determination on December 3, 1977. The Appeals Authority found conflicting evidence on the record and found the sum of the evidence "insufficient to support a conclusion of delinquency or misconduct by the appellant such as would disqualify him for consideration for future federal employment under the Commission's suitability standards." Decision on Appeal of James L. Harper, Plaintiff's Opposition to Motion for Summary Judgment, App. B, at 3.

On March 1, 1978, the Department of the Treasury issued corrected forms 50 (notification of personnel action) and 52 (request for personnel action) which reflected only that plaintiff resigned during his probationary period in lieu of being separated. The original forms were removed from plaintiff's official personnel folder, and the reasons for separation stated therein are no longer available to employers (and were never available to the public, other than employers). 5 C.F.R. § 294.702 (1978).

### The First Amendment Claim

In plaintiff's view, his dismissal was a direct result of his criticism of defendant Bruce to Gabourel. His exposure of Bruce's misconduct of Coin Branch affairs compromised Bruce and incurred his wrath. As a consequence, Bruce built a case against him and eventually prevailed upon his superiors to dismiss plaintiff. This, plaintiff claims, violated his first amendment right to free speech.[3]

The question whether a cause of action for damages may be stated under the first amendment was settled in the affirmative in this circuit by *Dellums v. Powell*, 184 U.S.App.D.C. 275, 302–03, 566 F.2d 167, 194–95 (D.C.Cir. 1977).

---

2. The name of the Civil Service Commission was changed on January 1, 1979, to the Office of Personnel Management, but for the sake of uniformity the Court will refer to it throughout this opinion as the Civil Service Commission.

3. Plaintiff seeks damages, as well as equitable relief, to remedy his first amendment injuries.

■ The Court's analysis commences with the observation that plaintiff's probationary status is irrelevant to his first amendment claims. Although the government may deny plaintiff the benefit of further government employment at any time during his probationary period for any number of reasons, "[i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *accord Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ The primary question to be resolved, then, is whether or not the speech that allegedly led to plaintiff's dismissal was speech protected by the first amendment. If it was not, then plaintiff has no constitutional claim. If it was, the Court must then determine whether the plaintiff's exercise of his constitutionally protected right was a "substantial" or "motivating" factor in his dismissal under the standard established by *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the criticism was a motivating factor then the government must show by a preponderance of the evidence that it would have reached the same decision even absent plaintiff's protected conduct. *Id.* Since the latter showing would involve resolution of several disputed issues of fact, a determination by the Court that plaintiff's speech was constitutionally protected and was a motivating factor in his dismissal would preclude an award of summary judgment for defendants.

In determining whether plaintiff's speech was protected, a significant, and undisputed, fact is that the speech in question was uttered completely within the context of plaintiff's employment relationship. This places the issue in a far different analytical framework than if a non-government employee were leveling the same criticism at the same government supervisor. The competing interests at stake here create a tension between the fundamental presumption that American citizens should be able to communicate ideas one to another free from government restriction, on one hand, and, on the other, the necessity for the government, as employer, to be able to preserve discipline, morale, and efficiency among its employees if it is to continue to serve the public. As the Supreme Court observed in *Pickering, supra*, 391 U.S. at 568, 88 S.Ct. at 1734:

> [I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State as an employer, in promoting the efficiency of the services it performs through its employees.

■ Although the Supreme Court has recognized that the employment relationship necessitates the addition of another factor into the analysis of what speech is protected by the first amendment, the ultimate criterion for any government restriction on speech is unaltered. The government must be able to show a compelling state interest before any restriction will be permitted, and any restriction must be as narrowly drawn as possible.

Although the *Pickering* Court laid no claim to having reached a comprehensive resolution of the problems created by the competing interests in this difficult area, it did establish guidelines for consideration of those problems. *Pickering* involved the dismissal of a public school teacher who had written a letter to the editor of a local newspaper in the wake of a controversial and unsuccessful proposal to increase the school tax rate. He had criticized the school board for favoring athletic programs at the expense of educational programs in its allocation of funds and for misleading the public as to those expenditures. The Court determined that some of his statements were true, some erroneous, but noted

that since the tax proposal had already failed at the polls the letter had no adverse effect on its passage.

The Court's first amendment analysis focused on four factors: (1) whether the speech involved a matter of legitimate public concern; (2) whether it affected close working relationships, a need for confidentiality, or other special employment relationships; (3) whether the statement was true, negligently false, or knowingly and recklessly false; and (4) the degree of harm caused by the statement in terms of disruption of the employee's duties or the employer's operations.

■ Applying its analysis, the Court concluded that statements on matters of public concern which are either true or only negligently false are generally protected by the first amendment. *Pickering, supra,* 391 U.S. at 570–73, 88 S.Ct. 1731. Knowingly and recklessly false statements generally are not, although the Court did hint that if they caused no harm there might be some circumstances in which they were protected. *Id.* at 574 n.6, 88 S.Ct. 1731.

The exceptions to these general rules vary with the extent to which special employer-employee relationships intervene, and to some degree, with the extent of the harm caused. *Id.* at 570–73, 88 S.Ct. 1731. *But see id.* at 584, 88 S.Ct. 1731 (dissenting opinion of White, J.). The Court ruled that completely accurate statements on matters of public concern are always protected unless an unusual need for confidentiality is shown, or if the employment relationship is of such an intimate and personal nature that public criticism would seriously undermine its effectiveness. *Id.* at 570 n.3, 88 S.Ct. 1731. Substantially accurate statements on matters of public concern are similarly protected, the Court concluded, absent a showing of a special relationship involving loyalty and confidence and absent a showing of interference with the employee's performance of his daily duties or the employer's operations. Finally, the Court held that negligently false statements on matters of public concern are protected unless the employer can show they impeded

the proper performance of the employee's daily duties, interfered with the regular operations of the employer, or compromised a special relationship. *Id.* at 572–73, 88 S.Ct. 1731. The Court's opinion implied that proportionately more weight was to be given to the harm caused, based on the extent to which the statement was accurate or erroneous. *Id.* at 572, 88 S.Ct. 1731.

■ In the case at bar, the Court can make two determinations at the outset. First, plaintiff Harper's criticism of his supervisor concerning the irregularities in the Coin Branch must be considered completely accurate on this motion for summary judgment. Second, the fact that he uttered his criticism in a private, rather than a public, forum does not detract, in the circumstances of this case, from the protection provided by the first amendment.

■ The first conclusion is dictated by the requirement that the disputed facts be construed most favorably to the non-moving party on a motion for summary judgment. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); the second by the Supreme Court's recent ruling in *Givhan v. Western Line Consolidated School,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

The Court held in *Givhan* that a public employee does not forfeit "his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." 99 S.Ct. at 696; *accord, Halperin v. Kissinger,* 196 U.S.App.D.C. ——, —— & n.45, 606 F.2d 1192, 1199 & n.45 (D.C.Cir. 1979). The Court did suggest that "time, place, and manner" restrictions might be placed on private expression of views when an employee confronts an immediate superior, 99 S.Ct. at 696 n.4, but in the instant case there was no such confrontation. And in any event, one could hardly imagine a more appropriate time, place or manner for plaintiff to voice his criticism than in a conference called specifically for the purpose of learning plaintiff's viewpoint. Plaintiff's response

was both reasonable and responsible, and the only one available under the circumstances.

These threshold questions aside, the Court turns to an application of the *Pickering* analysis to the facts of this case. Considering first the question of whether plaintiff's statement involved a matter of legitimate public concern, the Court concludes that it did. Plaintiff was criticizing a government official's conduct of the public's business, one of the most widely recognized areas of protected speech. *Garrison v. State of Louisiana*, 379 U.S. 64, 72–73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). *See New York Times Co. v. Sullivan*, 376 U.S. 254, 273, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Essentially, he was telling his superior that defendant Bruce was abusing his position of authority for his own personal gain and to the public's detriment. As the Supreme Court noted in *Garrison*, "few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation." 379 U.S. at 77, 85 S.Ct. at 217. While the public interest in the activities of the Coin Branch may be of a lesser order than in the conduct of more visible public agencies, there is a legitimate public interest nevertheless. *See generally, Bridges v. State of California*, 314 U.S. 252, 269, 62 S.Ct. 190, 86 L.Ed. 192 (1941); *Time, Inc. v. Hill*, 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

■ Since the Court concludes that the statements were of public concern, and it must be assumed that they were true, they are *ipso facto* protected under *Pickering* unless there were some exceptional need for confidentiality in the Coin Branch or unless the relationship between plaintiff Harper and defendant Bruce were of such a personal and intimate nature that public criticism would seriously undermine its effectiveness. *Pickering, supra*, 391 U.S. at 570 n.3, 88 S.Ct. 1731. Certainly there are no undisputed facts of record to support the existence of such a special relationship, and common sense suggests that the relationship between a GS–3 worker and his supervisor is hardly of such a sensitive nature as to require a special restriction on the exercise of first amendment rights.

■ The Court must assume on this record, then, that plaintiff's statements were protected and that he was dismissed for exercise of his first amendment rights. Since a dismissal of a government employee, even a probationary employee, for exercise of his first amendment rights is prohibited by the Constitution, *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), defendants' motion for summary judgment will be denied on this claim.

### The Official Immunity Defense

Defendant Bruce, the only defendant sued in his individual capacity, argues that even if plaintiff's claims against him are substantially correct, the doctrine of official immunity protects him from any liability for money damages. He maintains first that he is cloaked with absolute immunity, and, in the alternative, if the Court rejects the absolute immunity argument, that he is protected at least by qualified immunity.

■ Last term the Supreme Court comprehensively reviewed the question of immunity for federal officials in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Court ruled that most federal officials are entitled only to qualified immunity for actions violative of an individual's constitutional rights or outside the scope of their authority. *Id.* at 2911. A federal officer acting within the scope of his authority might be absolutely immune from a state-law claim, such as a claim for malicious defamation, *id.* at 2905, 2919; *accord, Barr v. Mateo*, 360 U.S. 564, 574–75, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *see Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), but he would be only qualifiedly immune if a constitutional violation, such as deprivation of first amendment rights, were involved. *Butz v. Economou, supra*, 98 S.Ct. at 2911. The limited exception to the above rule of qualified immunity for executive officials applies to those officers whose role resembles that

of prosecutor or judge in adjudicatory enforcement proceedings. *Id.* at 2912–16. Because of the special nature of their function, they are entitled to absolute immunity.

Because of the nature of the test for qualified immunity, the issue of whether Bruce is immune cannot be resolved at this stage of this lawsuit. *Butz* incorporated the test for qualified immunity developed for state officials in *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), which requires that an official must have had a good faith belief in the propriety of his actions to be immune. In determining whether an officer acted in good faith:

> It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* A decision on Bruce's qualified immunity defense, therefore, would require an investigation into his motives, belief in the truth of the facts he relied upon in making his decision, and his objectively evaluated conformance with known procedures and rights. *See Wood v. Strickland,* 420 U.S. 308, 320–22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (objective test). Although *Butz* counsels that such determinations should be made, when possible, on summary judgment to protect government officers from harassment suits, the good faith issue in this case requires a resolution of questions of fact hotly contested by the parties, a function not appropriate on a motion for summary judgment.

*Wood v. Strickland* requires not only that the action have been taken subjectively in good faith, but also that it have been objectively reasonable in light of information available at the time. If it were established that plaintiff had been fired because of his criticism, the Court might be able to apply the objective branch of the immunity test and reach a decision as a matter of law. But where even the underlying cause of the dismissal is in dispute, this is not possible.

Defendant Bruce also argues that his function in initiating disciplinary proceedings is analogous to that of a prosecutor, entitling him to absolute immunity. This defense is based on the following passage in *Butz*:

> We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.

98 S.Ct. at 2915.

Bruce's function, however, as plaintiff points out, is not analogous to that of a prosecutor. Rather, it is like that of a complaining witness. Although he recommends to his superiors that certain actions be taken, it is the superiors who review the matter and make the decision on whether or not to take disciplinary action. In this case the authority to decide whether a probationary employee should be dismissed was delegated by the agency director to a Mr. Villarreal, not Bruce. Plaintiff's Supplemental Memorandum, at 8–10; *see* Defendant's Supplemental Memorandum, at 8; Deposition of Melvin A. Bruce, at 10, 17–18; Defendant's Answers to Plaintiff's First Interrogatories, at Interrogatory 10.

Defendant's argument fails to convince the Court that his need to make recommendations to his superiors on personnel problems is one of "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Butz, supra* at 2911. Unlike the Secretary of Agriculture in *Butz*, Bruce was not making a discretionary decision involving effectuation of his agency's statutory mandate, with the need for insulation from suit attendant upon such broad

policy choices. He was involved only in recommending to a superior that an internal matter be resolved in a certain fashion, and could neither make the decision to act nor choose the sanction. *See Butz, supra* at 2915.

While it is true that tempers flare when jobs are at stake and that a supervisor's task is not a pleasant one in this respect, a grant of absolute immunity is not warranted here. Applying the standard stated in *Wood v. Strickland,* a grant of immunity would not sufficiently increase the supervisor's ability to exercise his discretion in a forthright manner to warrant the absence of a remedy for employees subjected to intentional or otherwise inexcusable deprivations of rights by that supervisor. 420 U.S. 308, 320, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Bruce's position is analogous to that of the school administrators in *Wood* who sought absolute immunity in cases involving student suspension or expulsion. The Supreme Court held that although they acted as "adjudicators in the school disciplinary process," exercising discretion, weighing facts, and formulating policy, a grant of qualified immunity "protecting their good-faith fulfillment of their responsibilities" was sufficient. *Id.* at 319–20, 95 S.Ct. 992.

An ancillary, but nonetheless important, consideration in this case is that the procedural protections of an adversary administrative hearing were not available to plaintiff, a probationary employee. *Butz* contemplated conferring absolute immunity on administrative officials with prosecutorial functions only when the "safeguards" of an administrative proceeding were available. *See Butz v. Economou, supra,* 98 S.Ct. at 2914–15. As the Court explained, "the le-gal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal." *Id.* at 2916. Plaintiff, however, was entitled to no administrative proceeding under existing agency regulations, and, with the exception of resort to the courts, was protected by none of the safeguards alluded to in *Butz.*

The Court concludes that defendant Bruce is not entitled to absolute immunity, and will leave open the question of qualified immunity for resolution on a more complete factual record.

### The Fifth Amendment Claim

Plaintiff's second claim is that defendants' failure to provide him an opportunity to rebut the charges of misconduct stated in the notice of dismissal deprived him of liberty without due process of law in violation of the fifth amendment.[4] He alleges specifically that the inclusion of the misconduct charges in his personnel file[5] prevented him from finding a job from the time of his dismissal up to the time he instituted this action. In addition, he alleges that those charges directly contributed to a determination by the Bureau of Personnel Investigations on January 19, 1977, that he was unsuited for employment in the federal competitive service.[6] Thus, plaintiff concludes that defendants' actions stigmatized him, foreclosing his opportunities for future employment and harming his reputation.

The Supreme Court has established a two-step test for determining when a hearing is required under the fifth amendment before a public employee may be dismissed. The court must first determine whether a liberty or property interest is at

---

4. The Supreme Court ruled in *Board of Regents v. Roth,* 408 U.S. 564, 574–75 & n.14, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sinderman,* 408 U.S. 593, 599 & n.5, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) that a government employee has no right to a due process hearing before dismissal merely because he asserts to his superiors that their decision was based on his constitutionally protected conduct. The Court refused to require a hearing as a "prophylactic measure against non-retention decisions improperly motivated by exercise of protected rights," *Roth, supra,* at 575 n.14, 92 S.Ct.

at 2708. Thus, plaintiff Harper's due process rights were not violated by the agency's failure to accord him a hearing on his *first* amendment claim.

5. This information is available to prospective employers pursuant to 5 C.F.R. § 294.702 (1978).

6. That decision was later reversed by the Federal Employee Appeals Authority on December 3, 1977.

stake. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[7] If it finds that such an interest is involved, then the court must balance the interests of the individual against those of the government in determining precisely what procedural rights should be accorded him. *Id.* at 570 n.8, 92 S.Ct. 2701; *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Plaintiff does not press the issue of whether or not he had a property interest in continued government employment, Plaintiff's Opposition to Motion to Dismiss, at 17, and it appears that as a probationary employee, he did not. *Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182, 191, 562 F.2d 701, 710 n.23 (D.C.Cir. 1977); *see Cafeteria Workers v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Ring v. Schlesinger*, 164 U.S.App.D.C. 19, 26–27, 502 F.2d 479, 486–87 (D.C.Cir. 1974). Instead, he rests his claim on the allegedly improper impairment of his liberty interests in his reputation and future employment.

■ The Supreme Court observed in *Roth* that an individual's liberty interest would be impaired where the government's action injured him in one of two ways: either where it injured his good name, reputation, honor or integrity; or where it "imposed upon him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707. The Court subsequently modified this ruling to require a distinct alteration of legal right or status, in addition to injury to reputation, before a liberty interest will be implicated. *Paul v. Davis*, 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). *See generally, Mason v. Claytor*, 459 F.Supp. 174 (D.D.C. 1978).

■ In the employment context, even where there is a distinct alteration of status, such as a dismissal, that in itself will not be considered stigmatizing if it merely impedes the former employee in his job search.

> To infringe one's liberty, the effect of government action on future employment must extend beyond a disadvantage or impediment; it must 'foreclos[e] his freedom to take advantage of other employment opportunities.'

*Mazaleski v. Treusdell, supra*, 183 U.S.App. D.C. at 194, 206, 562 F.2d at 713. Action foreclosing *government* employment alone, however, would be sufficient. *Id.*

■ In the case at bar, even considering only the undisputed facts, the Court is convinced that plaintiff was entitled to a hearing. There is no question that he was dismissed, Defendants' Statement of Material Facts, at 2, so the alteration-of-status requirement of *Paul* is met. In addition, it is undisputed that the charges of misconduct were included in his personnel file. *Id.*

The inclusion as a reason for dismissal on plaintiff's Standard Form 50 that he made "threats of physical harm" to his coworkers and superiors is a charge of serious enough degree to be considered stigmatizing and to warrant due process protection. Such a charge is at least as serious as a charge of dishonesty, a characterization considered stigmatizing in this circuit. *Mazaleski v. Treusdell, supra*, 183 U.S.App.D.C. at 195, 562 F.2d at 714; *see Rolles v. Civil Service Commission*, 168 U.S.App.D.C. 79, 512 F.2d 1319 (D.C.Cir. 1975). And the fact [8] that his dismissal on misconduct charges directly contributed to a determination that he was unsuited for employment in the competitive service is ample indication that the charges were of a serious enough nature to foreclose future government employment. Thus,

---

7. While *Roth* involved an interpretation of the fourteenth amendment's due process clause, that interpretation is equally applicable to the due process clause of the fifth amendment. *Mazaleski v. Treusdell*, 183 U.S.App.D.C. 182, 190, 562 F.2d 701, 709 n. 22 (D.C.Cir. 1977).

8. This is established by the decision of the Federal Employee Appeals Authority on plaintiff's appeal of the unsuitability determination entered against him. See Plaintiff's Opposition to Motion for Summary Judgment, App. B., at 3. Defendants do not dispute this.

plaintiff has been stigmatized "in the course of termination of employment" in consonance with the requirements of *Paul v. Davis, supra*, 424 U.S. at 710, 96 S.Ct. 1155, and *Roth, supra*, 408 U.S. at 569, 92 S.Ct. 2701, and should have been afforded some opportunity to refute the charges of misconduct before they were included in his personnel file and made available to prospective employers. Consequently, this Court rules as a matter of law that plaintiff's fifth amendment due process rights were violated by the agency's failure to grant him a hearing.

The Court's ruling is strictly limited, however, to the narrow issue of plaintiff's entitlement to a hearing at the time he was dismissed. There is no question that his fifth amendment rights were violated then, but there is a serious question as to the availability of relief now. It is possible, as discussed below, that there may be no relief the Court can grant to redress plaintiff's past injury and that plaintiff may be suffering no present injury.

*Relief on the Fifth Amendment Claim*

■ To remedy his injuries, plaintiff requests the Court to grant him: a declaratory judgment striking down the statute and regulations permitting the dismissal of a probationary employee for stated reasons of misconduct without a prior hearing; rein-

statement with back pay[9] (or, in the alternative, an order requiring reinstatement until a decision is reached following a hearing); compensatory and consequential damages against the defendants sued in their official capacity; compensatory and punitive damages against defendant Bruce in his individual capacity, and certain other relief.[10] He has requested this relief both on his first and fifth amendment claims. Because the Court has postponed consideration of the first amendment claim, both on the issue of liability and of relief, until a more complete factual record is developed, it will here consider the question of relief only as it relates to the fifth amendment claim.

■ The Court first observes that reinstatement and back pay are not available remedies for defendants' failure to provide plaintiff a hearing. Since plaintiff, as a probationary employee, had no fifth amendment property interest in his job, any due process hearing ordered by the Court would not encompass a consideration of whether he was properly dismissed. *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). *Codd* ruled that where a public employee has no property interest in his job, the sole purpose of the hearing is to provide him an opportunity to clear his name.[11]

9. It is not completely clear that plaintiff requests this relief on his fifth amendment claim, see Complaint, Relief section, para. 2, but this is unimportant in light of the Court's conclusion that this relief is unavailable in any event.

10. There is no question that a cause of action may be stated under the procedural due process component of the fifth amendment for equitable relief. *Mazaleski v. Treusdell*, 183 U.S. App.D.C. 182, 562 F.2d 701 (D.C.Cir. 1977); *see Davis v. Passman*, —— U.S. ——, ——, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (D.C.Cir. 1974). Although not clearly established, it also appears that a cause of action for *damages* may be stated under the procedural due process component, if it is found that no other remedy is available. The Supreme Court recently held in *Davis v. Passman, supra*, —— U.S. at ——, ——, 99 S.Ct. 2264, that a cause

of action for damages may be stated under the substantive due process component of the fifth amendment, and the analysis there employed would seem to be equally applicable to procedural due process cases. *Id.* In light of this Court's conclusion that damages may not be available to plaintiff, however, it need not decide this question at this time.

11. The Court's statement that the hearing is solely to clear the employee's good name must be read in light of its subsequent opinion in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Court there held that an employee may be entitled to nominal damages merely for the deprivation of the hearing, even if the charges against him prove to be true. *Carey*, however, does not detract from the force of the *Codd* Court's reasoning that the validity of the dismissal is not at issue.

[T]he contemplated hearing does not embrace any determination * * * which would in effect be a determination of whether or not, conceding that the report were true, the employee was properly refused re-employment. Since the District Court found that respondent had no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for failing to rehire him presents no federal constitutional question.

*Id.* at 627–28, 97 S.Ct. at 884.

The purpose of the hearing, then, is to vindicate the employee's fifth amendment liberty interest, that is, his interest in not having his reputation seriously injured or his employment opportunities foreclosed by his employer's public disclosure, without a hearing, of the charges that led to his dismissal. Any consideration of reinstatement or back pay in this context would be inappropriate.

■ There are also serious, and perhaps insurmountable obstacles to recovery of damages for the failure to grant plaintiff a hearing. Plaintiff is foreclosed from recovering damages from any of the defendants sued in their official capacities. Any recovery against them would be tantamount to an award of damages against the federal government,[12] a possibility precluded by the doctrine of sovereign immunity.[13]

Since plaintiff has sued all the defendants, with the exception of Melvin Bruce, in their official capacities, Complaint, para. 2–7, the only defendant from whom damages could possibly be recovered is Bruce. And while Bruce might theoretically be liable in damages for failure to grant plaintiff a hearing, plaintiff has not alleged that it was Bruce who denied him the hearing, or even that it was within the scope of Bruce's duties or authority to decide whether or not to afford a discharged employee a hearing. Rather, he states that his requests for a hearing were directed, not to Bruce, but to other defendants, all of whom are sued in their official capacities. Complaint, para. 21, 22. While plaintiff may possibly be able to establish that Bruce was culpable in this regard, it appears doubtful at this point.

■ If it is assumed that Bruce was not responsible for the denial of the hearing, the only possible basis remaining for awarding damages against him would be the alleged defamation that precipitated plaintiff's dismissal and led to the necessity for a hearing. But this claim, too, is unavailing. As the Court ruled in *Carey v. Piphus*, ". . . the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." 98 S.Ct. 1042, 1054 (1978). The other side of that coin is that the Court need not consider the merits of plaintiff's substantive assertions in ruling on a procedural due process claim. *Bishop v. Wood* makes clear that, in deciding whether a government employee's *liberty* interest has been impaired, the truth or falsity of the reasons given for his discharge is not an issue of constitutional proportions and should not be considered. 426 U.S. 341, 349, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Mr. Justice Stevens, speaking for the Court, said:

The truth or falsity of the City Manager's statement determines whether or not his decision to discharge the petitioner was

---

**12.** *See Monell v. Dept. of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**13.** For a discussion of the doctrine of sovereign immunity, its origins, and application, see *Nevada v. Hill*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979).

Plaintiff did not file a claim pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671– 2680 (1976), so the question of an exception to the sovereign immunity bar to damage claims does not arise. And, although the Administrative Procedure Act waives sovereign immunity for other claims, it contains no waiver for damage claims. 5 U.S.C. § 702 (1976).

The sovereign immunity bar would apply, of course, *a fortiori* to any claim directly against the agency.

correct or prudent, but neither enhances nor diminishes petitioner's claim that his constitutionally protected interest in liberty has been impaired.[13]

> [13] Indeed, the impact on petitioner's constitutionally protected interest in liberty is no greater even if we assume that the City Manager deliberately lied. Such fact might conceivably provide the basis for a state-law claim, the validity of which would be entirely unaffected by our analysis of the federal constitutional question.

*Id.* at 349 & n.13, 96 S.Ct. at 2080.[14]

Under this ruling, even if defendant Bruce were responsible for the denial of the hearing, he still would not be liable for the alleged defamation; that claim would be left for resolution under state law. If plaintiff could show that Bruce's failure to grant him a hearing aggravated his injury from the defamation, however, then he would be able to recover damages for the increased harm. That would be an injury stemming from the denial of procedural due process and would be compensable as such. For example, if plaintiff could show that the charges were false and that they would never have been disseminated to potential employers if a hearing had been held, then he would be entitled to damages for the additional harm caused to his reputation and employment opportunities by the dissemination of the charges.

Consequently, the Court concludes that plaintiff will be foreclosed from any recovery of damages unless he can establish that defendant Bruce was the party responsible for denying him a hearing.

Since reinstatement and damages have been excluded from present consideration, the remaining possibility for relief would be an injunction or mandamus order (perhaps coupled with a declaratory judgment) requiring defendants to hold a remedial hearing to allow plaintiff an opportunity to clear his name. *See Codd v. Velger, supra,* 429 U.S. at 627–28, 97 S.Ct. 882 (remedial hearing appropriate in some cases). Plaintiff's claim for this relief is mooted at least in part, however, by the fact that all references to the charges of misconduct were removed from his official personnel file on March 1, 1978. Defendants' Statement of Material Facts, para. 7; *see* Plaintiff's Statement of Material Facts, para. 10. Thus, there can be no future injury to his good name or employment opportunities from future release of the misconduct charges. Plaintiff's only current injury is from the lingering effects on his reputation and employment opportunities of the earlier releases of the charges. This injury is further limited by the fact that the charges could be released only to prospective employers, not the general public. 5 C.F.R. § 294.702(c), (g) (1978).

The only purpose of a remedial hearing, then, would be to erase the blot on plaintiff's good name caused by the releases of the misconduct charges to employers from December 12, 1975, until March 1, 1978. The hearing could in no way compensate plaintiff for lost job opportunities or mental suffering. Considered in this light, it is possible that a remedial hearing could do no more for plaintiff than has already been accomplished by the decision of the Federal Employee Appeals Authority entered on December 3, 1977. If that were true, this claim for relief would be moot.

After reviewing the evidence supporting the misconduct charges against plaintiff, the Appeals Authority, an arm of the Civil Service Commission, ruled in that decision that there was:

> . . . insufficient evidence to support a conclusion of delinquency or misconduct by [plaintiff] such as would disqualify him for consideration for future federal

14. The charges in *Bishop* had not been publicly disclosed, but even if they had been the Court would not have looked to their truth or falsity in determining whether a hearing should have been granted. That decision rests on whether or not the reasons disclosed for the dismissal were stigmatizing, a determination that can be made without reference to their truth or falsity. Of course, the issue of truth or falsity may be relevant to plaintiff's first amendment claim in this case, but that claim is not considered here.

employment under the Commission's suitability standards.

Plaintiff's Opposition to Motion for Summary Judgment, App. B, Decision of Federal Employee Appeals Authority on Appeal of James L. Harper, at 3. This finding reversed a determination by the Bureau of Personnel Investigations on January 19, 1977, based largely on the charges of misconduct in plaintiff's personnel file, that he was unsuited for future employment in the competitive federal service. *See generally* 5 C.F.R. §§ 731.201 *et seq.* (1978).

The precise effect of the Appeals Authority decision is not completely clear, but if defendants can establish that its curative effect on the injuries to plaintiff's good name and employment opportunities is as great as that of any hearing this Court could order, then the need for a remedial hearing would be obviated.

*Conclusion*

On the basis of the foregoing, the Court concludes that there are material issues of genuinely disputed fact remaining to be resolved in this case which prevent the entry of summary judgment under Fed.R. Civ.P. 56(c). Consequently, defendants' motion must be denied.

This opinion shall constitute the Court's finding of material facts existing without substantial controversy under Rule 56(d) of the Federal Rules of Civil Procedure.