AMERICAN POSTAL WORKERS
UNION, AFL–CIO, et al.,
Plaintiffs,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

Civ. A. No. 84–909.

United States District Court,
District of Columbia.

Nov. 8, 1984.

Darryl J. Anderson, Anton Hajjar, Washington, D.C., for plaintiffs.

Mitchell R. Berger, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This action was brought by a discharged postal worker, Joseph Gordon, and his union seeking reinstatement, back pay and other relief on grounds that the discharge violated the contract between the union and the Postal Service and also violated the First Amendment rights of Gordon and his union. The case is before the Court on defendant's second motion for summary judgment and plaintiff's cross-motion for partial summary judgment, which have been fully briefed by the parties.

In disposing of defendant's first motion for summary judgment, the Court granted judgment for the defendant on plaintiffs' claim of a contract violation but denied summary judgment on plaintiffs' constitutional claim, stating it appeared to the Court "that a number of material facts remain in dispute, including (i) whether the firing was based on speech or on underlying conduct described in the speech, (ii) whether the government was actually harmed by the speech, and (iii) whether plaintiff Gordon knew or should have known that the speech would harm the government." [1]  (Order of September 7,

---

1. The Court also held that plaintiffs' constitu- tional claim could go forward only as to equita-

1984 at 1–2.) Defendant then proposed to assume for the purposes of summary judgment that the discharge was based on speech, not the underlying conduct, and accordingly to seek summary judgment on the remaining issues, identified as (ii) and (iii) above. It was understood that if defendant lost again on summary judgment, and if plaintiff won its own summary judgment motion on those issues, the only remaining issue would be whether Gordon's speech was a substantial or motivating factor in the discharge decision. *See Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Plaintiffs agreed to this procedure, and subsequently filed a cross-motion for partial summary judgment. Thus these motions focus on whether Gordon's speech was protected by the First Amendment,[2] and if so, whether his employer's interests outweigh his right to free expression because of the harmful effects of his speech.

## I. The Background

Joseph V. Gordon was an employee of the Postal Service for 11½ years in Royal Oak, Mich., until he was fired on July 7, 1982. While an employee, he received several commendations and monetary awards from the Postal Service, including an award for heroism in 1981 for putting out a dangerous fire that resulted from a collision between a car and a mail truck. Gordon was a steward in Area Local 480–481 of his union and was editor of the local's newspaper, The 480–481 Communicator, for which he wrote a regular column.

His column in the May 1983 issue was entitled "Workers of the World Unite . . . ." The column's theme was the need to persuade non-members to join the union by "tactful intelligent" efforts rather than by "strong arm" tactics. After suggesting various benefits of joining the union that could be brought up in conversation with non-members, the column stated:

I was motivated to write this article at this time by a recent discovery that I made at work. While working third class letters a few weeks ago I came across a bundle of letters that were being sent from Congressman Phillip Crane, a Republican from Illinois, the return address simply stated: Congressman Phillip Crane, National Right to Work Committee. Well, naturally I was curious just what the Congressman was trying to communicate under such a dubious association with the right to work committee. My curiosity did not have long to wait because one of the letters was not sealed and the contents fell out as I was sorting the mail. I could not help but seeing just what was inside. I was amazed to find that the Congressman was sending out petitions asking for help in an attempt to organize a legislative effort to support a bill that would restrict Labor Unions from organizing workers through what he called strong arm tactics.

The column went on to conclude that "[i]t has been painfully evident that we have many enemies in Congress and we can ill afford to have them attempt to organize efforts to further reduce our ability to improve our working conditions. . . . Ask your stewards who the non-members are in your office and make a tactful intelligent effort to sign them up, but don't use 'strongarm' tactics, it might upset Phillip Crane."

The newspaper has a circulation of about 2,100. It is sent to members and retired members of Local 480–481 and to the offices of other postal union locals.

After the column came to the attention of Postal Service officials, Gordon was questioned by supervisor Charlene Bonds, on the night of May 26, 1983 after he arrived for the shift starting at midnight. She told him that he had violated two Post-

---

ble and declaratory relief, finding that the Federal Tort Claims Act did not waive sovereign immunity for constitutional tort actions for money damages against the United States.

**2.** The Court considered this issue tentatively in its Order of September 17, 1984, denying defendant's motion for reconsideration of the Court's September 7, 1984 Order. The issue is considered more fully and finally herein.

al Service regulations by reading the piece of mail and disclosing its contents, and that he could be discharged. He told her that he had made up the story about reading the mail on the job as a "dramatization." He also said he did not know that reading third-class mail meant for publicity was a violation, although he did know that reading personal mail was a violation. She asked him to make a written statement, which he did before returning to his work station. In the statement, he said in part

I was made aware of the [Crane] petition by a friend who was asked to sign it. He later in turn asked me about a right of Congressmen to use the priv[ilege] of the free mail to distribute such material. I didn't think it was right for postal workers to have to handle such mail and fabricated the story about finding the "Crane" mail myself. I did not see, personally, the petition but I bel[ie]ve it existed. The irony that I was trying to stress as a representative of the labor movement and especially the American Postal Workers Union, is that there are rich people in this country that want to get richer off the labor force.

Immediately after he got off work that shift, Gordon wrote a retraction that was published in the next month's issue of The 480–481 Communicator.[3] The retraction referred to the described incident as "a fabrication for dramatization" and added, "I attempted to show the irony of the labor force (APWU) handling mail such as this, it was a mistake. It is illegal to disclose the contents of mail even if the mail is meant for further distribution."

The day after his meeting with the supervisor, the Postal Service informed Gordon by a "Notice of Removal" that he was to be removed from the Postal Service on July 7, 1983. The notice described his May 1983 column and said:

You have violated Part 115 of the Domestic Mail Manual, specifically Part[s] 115.2 and 115.5 which prohibits the reading, divulging, or disclosing of the contents of mail. Such reading and publication of the contents is also considered unacceptable and a violation of Part [661.53][4] of the Employee and Labor Relations Manual.

Gordon and his local union grieved the dismissal. The final decision on the grievance stated that Gordon's "action in the instant grievance violated the integrity of the mail service and part 115.5 of the DMM. Accordingly, just cause was established and this grievance is denied."

Article 16 of the collective bargaining agreement between the union and the Postal Service provides in pertinent part:

No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations.

The union sought arbitration of the grievance. A hearing was held on October 12, 1983. The arbitrator upheld the firing by an opinion dated December 23, 1983. The opinion did not decide the factual dispute about whether Gordon had read and disclosed the contents of mail that he saw on the job, but said that true or not, the column had the effect of eroding public confidence in the sanctity of the mails. The collective bargaining agreement be-

---

**3.** The June issue had already gone to the printer. Gordon testified at the arbitration that he delivered the retraction to the printer on May 27, the same day he wrote it.

**4.** Section 661.53 of the Employee and Labor Relations Manual of the Postal Service provides in part that "[n]o employee will engage in criminal, dishonest, notoriously disgraceful or immoral conduct, or other conduct prejudicial to the Postal Service." This provision is also contained in the Code of Ethical Conduct for Postal Employees published in the Code of Federal Regulations. 39 C.F.R. § 447.25(c). The ethical code lists a number of specific types of proscribed conduct but not the reading or disclosing of mail. The Domestic Mail Manual, which does contain the ban on reading and disclosing mail, is incorporated by reference in the Code of Federal Regulations, 39 C.F.R. §§ 111.1–111.-5, which lists the manual's table of contents and the locations where it can be read.

tween the union and the Postal Service provides that "[a]ll decisions of an arbitrator will be final and binding."

This action was filed on March 22, 1984. Count One was the contract claim alleging that the discharge of Gordon "was not for 'just cause,' and was in violation of the collective bargaining agreement," and that the arbitrator's decision was "contrary to law and fact, beyond his authority, and not based on the collective bargaining agreement." As previously noted, on September 7, 1984, the Court dismissed the contract claim, stating that "the arbitration award was sufficiently based on the arbitrator's understanding of the contract that the award did not step beyond the arbitrator's authority. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 [80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424] (1960)." (Order of September 7, 1984 at 1.)

Count Two alleged that the discharge violated the rights to free speech and free press of Gordon, the union, the union's members and postal workers in general.[5]

## II. The Constitutional Claim

■ Because an arbitrator's authority derives solely from the contract and his expertise is confined to interpreting that contract, an arbitration decision against an employee does not bar an employee from bringing a separate judicial action alleging violation of statutory or constitutional rights arising from the same facts that brought about the contract dispute. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 56–60, 94 S.Ct. 1011, 1023–1025, 39 L.Ed.2d 147 (1974). *See also Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 745–46, 101 S.Ct. 1437, 1447–48, 67 L.Ed.2d 641 (1981). Similarly, an arbitrator's findings of fact against an employee cannot be given preclusive res judicata or collateral estoppel effect in a judicial proceeding to enforce First Amendment rights. *Mc-*

*Donald v. City of West Branch*, — U.S. —, 104 S.Ct. 1799, 1804, 80 L.Ed.2d 302 (1984).

The arbitrator held the discharge appropriate even if based entirely on Gordon's newspaper column and not on the underlying conduct apparently revealed by the column. This decision is not entitled to any weight in adjudicating the present constitutional claim.

■ In deciding whether governmental action infringes on a public employee's constitutionally protected right of free expression, the court must "seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

■ The employee has the initial burden of proof in such cases of showing that his conduct was constitutionally protected.[6] If the employee can show that the speech "touch[ed] upon a matter of public concern," *Connick v. Myers*, 103 S.Ct. at 1690, the burden then shifts to the employer to demonstrate that its interest "in the effective and efficient fulfillment of its responsibilities to the public," *Connick*, 103 S.Ct. at 1692, outweighs the employee's interest in discussing matters of public concern and the public's interest in listening to such discussion. *See Connick*, 103 S.Ct. at 1687, 1692–93; *Pickering*, 391 U.S. at 568, 571–72, 88 S.Ct. at 1736–37.

### A. Protected Speech

■ A public employee's speech is constitutionally protected only if it can be

---

**5.** The Court considers herein only the First Amendment claim of Gordon, since the relief now sought by the union substantially coincides with any relief the Court could grant to Gordon.

**6.** The employee also must show that this protected conduct was a substantial or motivating

factor in the discharge decision. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). As has been noted, that issue has been reserved for later disposition if necessary.

"fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 103 S.Ct. at 1689. This is determined "by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 1690.

Gordon's published column, including the statement about the Crane letter, clearly constitutes speech on a matter of public concern, and the Court so holds. The column concerns not only strategies for increasing union membership, itself protected by statute, but also touches on the much-discussed issue of how unions should respond to the right-to-work movement.[7] The right-to-work issue is particularly relevant for postal workers because postal employees are protected by statute from having to join any union. *See* 39 U.S.C. § 1209(c).

The labor movement orientation of Gordon's column is set at the outset in the column's title, borrowed from Karl Marx, and is developed most clearly in the discussion of the Crane letter. In this context, the statement about finding and reading the Crane letter while sorting third-class mail clearly represents an attempt to underscore the column's theme that non-union workers should be persuaded that their common interest lies with their fellow workers and not the right-to-work movement.[8] The column carries on a long tradition of union writers appealing for worker solidarity.

Gordon's column is in sharp contrast to the speech that the Court in *Connick* found unprotected in most respects because it basically concerned internal office politics. *See Connick*, 103 S.Ct. at 1691. The Court there expressly did not hold that all speech concerning labor matters was not of public concern. *See id.* at 1691 n. 8. Rather, it simply properly rejected the effort to attach a broader meaning to statements of purely personal interest. *See, e.g., Murray v. Gardner*, 741 F.2d 434, 438 (D.C.Cir.1984); *Foster v. Ripley*, 645 F.2d 1142, 1148 (D.C.Cir.1981). In this case, Gordon's personal interest in his statement, if any, is remote and does not detract from the statement's presentation of matters of public concerns.[9]

In asserting that Gordon's speech deserves little if any constitutional protection, the Postal Service focuses on Gordon's assertion that he never opened the mail but only said he did to dramatize his theme about the right-to-work movement. The Postal Service thus repeatedly characterizes Gordon's speech as a "knowing lie" or a "knowingly false statement of fact." The defendant then emphasizes that libel law does not protect knowingly or recklessly false statements,[10] and asserts the same lack of protection should be found here.

The Court must reject this invitation to read the reference to the Crane letter, wrested from context, as a mere statement that a postal employee has read a piece of mail on duty. As noted above, the Court's duty in considering the consti-

---

7. Cf. *Eastex, Inc. v. National Labor Relations Board*, 437 U.S. 556, 569, 98 S.Ct. 2505, 2514, 57 L.Ed.2d 428 (1978), upholding NLRB finding that union newsletter concerning a proposed right-to-work state constitutional amendment was protected "mutual aid or protection" activity under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157. The statutory protections of Section 7 are applicable to the Postal Service. *See* 39 U.S.C. § 1209(a).

8. Of course, it is not for this Court to pass on the merits of this belief. *See Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972). The Court is limited to determining whether the subject matter of the speech was of public concern.

9. Cf. *American Postal Workers Union v. U.S. Postal Service*, 595 F.Supp. 403, 406 (D.Conn. 1984), finding a private dispute between the Postal Service and the union on jobs affected matters of public concern and thus speech relating thereto was protected.

10. In both this and its earlier summary judgment motion, defendant relies on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), for the proposition that "there is no constitutional value in false statements of fact." *Id.* at 340, 94 S.Ct. at 3007.

tutional issue is to judge the statement in its entire context based on the full record.[11]

It would be pernicious to withhold constitutional protection for public employee speech whenever the statement can be found to be knowingly false. This would allow a speaker to be punished for a statement that amounted to no more than a harmless fiction or an apocryphal story that illustrated his theme but was not literally true.[12] Such fictions are stock-in-trade for politicians and others speaking on issues of public concern. Absent harm in a real sense, such parables can hardly even be called lies or knowing falsehoods. Obviously the injurious nature of the statement to the employer must also be considered.

■ In *Pickering*, the Supreme Court indicated that an employee could be fired for *injurious* false statements that were knowingly or recklessly made. 391 U.S. at 574, 88 S.Ct. at 1737. But the Court expressly left open the question "whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any harmful effects, still be protected by the First Amendment." *Id.* at 574 n. 6, 88 S.Ct. at 1738 n. 6. The present case requires the Court to confront that question. Otherwise protected speech cannot lose its constitutional protection solely by virtue of containing a knowingly or recklessly false statement, absent a showing of the harmful nature of the speech.

### B. The Government's Interest

Accordingly, the Court must consider whether there has been such a showing of harm in this instance that "the government's interest in the effective and efficient fulfillment of its responsibilities to the public," *Connick*, 103 S.Ct. at 1692, outweighs the employee's interest in free speech and thus justifies Gordon's discharge.

■ This balancing of the employee's interest in speech and the employer's interest in its responsibilities to the public will vary depending on a number of factors, including the nature of the employee's expression and how substantially it involves matters of public concern. *Connick*, 103 S.Ct. at 1692–93. Other factors include whether the speech occurred on an employee's own time and in non-work areas of the workplace, *id.* at 1693 n. 13, whether the nature of the work requires close working relationships easily upset by defiant employee speech, *id.* at 1692, whether the speech concerned the employee's own employment, *id.* at 1693, and whether the speech violated announced office policy, *id.* at 1693.

■ The government argues that even if there is some protection for what it characterizes as "knowingly false" speech, it needs to make "only the most minimal showing of injury" to defeat the constitutional protection. It relies on the same argument made and rejected above. The extent of harm caused by an employee's speech is a separate objective inquiry that does not turn on the speaker's subjective state of mind.[13] A showing of state of

---

**11.** In addition, defendant seriously misreads the law of libel. Under libel law, it is only when a false statement of fact is defamatory that it is subject to liability. Courts routinely dismiss libel claims where no defamation occurred, without reaching the issue of whether the statement was false or even knowingly false. *See, e.g., Franklin Music Co. v. American Broadcasting Cos. Inc.,* 616 F.2d 528, 541 (3d Cir.1980); *Southard v. Forbes, Inc.,* 588 F.2d 140, 144–46 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979). *Cf. McBride v. Merrell Dow & Pharmaceuticals, Inc.,* 717 F.2d 1460, 1464–65 (D.C.Cir.1983). A statement's falsity, and the speaker's knowledge of its falsity, are assessed only after it has been determined that the statement was injurious, and then as an assessment of the speaker's culpability, not as a substitute for the finding of injury.

**12.** Here, of course—accepting Gordon's statement that he did not in fact open the Crane letter—his statement was not literally true. But in its intended purpose—showing that a postal worker had sorted the Crane letter and thus had unwittingly contributed to furtherance of its message—it was true.

**13.** As will be discussed below, a speaker's knowledge of his statement's falsity is evidence of his culpability in the harm caused by the statement only where the nature of the statement is intrinsically harmful. Where extrinsic

mind cannot substitute for the showing of injury.[14]

While there are cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made into actual disruption of the employer's "responsibilities to the public," there are other cases of less obvious harm where the employer must show actual, not merely presumed, disruption of its ability effectively and efficiently to fulfill its responsibilities. *Compare McGehee v. Casey*, 718 F.2d 1137, 1148–49 (D.C.Cir.1983) (CIA need not show actual harm from publication of classified documents but still must "justify censorship with reasonable specificity" to court) *with Tygrett v. Barry*, 627 F.2d 1279, 1285 (D.C.Cir.1980) (government must show actual harm from employee speech, not just "reasonable inference"). *See also Hanson v. Hoffman*, 628 F.2d 42, 49–50 (D.C.Cir. 1980) (discussing employee speech cases where summary judgment found inappropriate due to inadequately developed facts relating to harm to government's interests). In *Connick v. Myers*, the Supreme Court deferred to the judgment of the employee's supervisors that the speech at issue had disrupted an office where close working relationships were essential to the office's smooth functioning. 103 S.Ct. at 1692 & n. 11. In that case, the speech focused only minimally on matters of public concern. Accordingly the Court stated, "We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Id.* at 1692–93.

This is a case where the Court has concluded that a stronger showing, involving

more than just a presumption of harm, is necessary. The speech did concern a matter of substantial public concern. It was written off-duty and off-premises and publicized through a limited-distribution newspaper. Other factors deemed relevant by the Court in *Connick* are present here. This was not a workplace like that in *Connick* where a close working relationship between supervisors and employees was essential to proper functioning. Nor was the objectionable portion of Gordon's speech, once retracted and explained, substantially likely to impair Gordon's long-standing satisfactory relationship with his supervisors.

The evidence that the Postal Service has chosen to present on the harm caused by Gordon's speech is contained in an affidavit by its chief postal inspector, Kenneth H. Fletcher.[15] That affidavit shows no awareness of the particular facts of this case.[16] It emphasizes that "[t]he Postal Service places the highest priority on maintaining the public's confidence in the integrity of the mails," Affidavit at ¶ 12, and that "[i]t is crucial that the public have confidence that the Postal Service will deliver all types of communications ... without bias or favoritism for or against any person, group, political party or organization or its members," *id.* at ¶ 17. The Court fully accepts the dedication of the Postal Service to these propositions and the importance of maintaining the security of all classes of mail. But the affidavit contains no evidence that Gordon's speech harmed public confidence in the Postal Service. There is no evidence that Gordon's speech was pub-

facts must be shown to demonstrate the harm from a statement, a separate state of mind inquiry is required into the speaker's culpability as to those extrinsic facts.

**14.** The cases cited by defendant, *Fracaro v. Priddy*, 514 F.Supp. 191 (M.D.N.C.1981) and *Harper v. Blumenthal*, 478 F.Supp. 176 (D.D.C.1979), are in accord with the Court's analysis. Those cases stand for the simple proposition that given a certain increment of harm caused by speech, the employee who speaks in knowing or reckless falsehood will be more liable than one who speaks only negligently. This is not doubted.

**15.** The Postal Service has certified that no material facts remain in dispute preventing adjudication of either its or plaintiffs' motions for summary judgment.

**16.** In *Connick*, by contrast, where the Supreme Court found only a minimal showing of harm necessary, there was testimony from two of the employee's supervisors with direct knowledge of the case. 103 S.Ct. at 1692 & n. 11.

licized outside a small segment of the Postal Service and its union, and there is no evidence that any member of the public complained or otherwise brought the matter to the Service's attention.

Even if the Postal Service were required to show only presumed, not actual, harm to its public image, the Court would hesitate to find that such harm reasonably could be presumed on these facts. If Gordon had discussed opening and reading a piece of first-class mail, whose privacy is sacrosanct, harm to the public perception of mail privacy might be more easily presumed. Third-class mail, which is generally meant for the widest possible public dissemination of advertising and other "junk" mail, should not be subject to such an automatic presumption.[17] The case also might be different if Gordon's statement had been broadcast outside the Postal Service and the union membership.

The Postal Service affidavit identifies a second type of harm, stating that "[a]ny action on the part of a postal employee—especially an employee with influence among his co-workers—which would tend to lessen the resolve of his fellow employees to safeguard the mails seriously detracts from this effort." *Id.* at ¶ 7. This generalized conclusion, however, is again not brought home to this case. No facts are presented as to whether Gordon's co-workers even knew that the conduct described in his original column violated a regulation until he told them so himself in his retraction, much less that it tended to lessen their resolve to safeguard the mails.

Besides harm to public confidence and to the work of fellow employees, the affidavit asserts a third and final type of harm justifying Gordon's discharge, that "[s]uch statements, whether true or not, demonstrate the unsuitability of the individual for employment in the Postal Service because such statements are a repudiation of an essential function of the employee's job." *Id.* at ¶ 21. But this is again a conclusion,

not a fact. There is no basis given for doubting the sincerity of Gordon's claim that any "repudiation" was unintended.

The Postal Service has failed to meet its burden of showing any actual harm from the speech, much less harm substantial enough to outweigh the interest in free speech. On the other hand, plaintiffs have shown a strong First Amendment interest in the protection of Gordon's speech.

Moreover, where the likelihood of harm is not apparent on the face of the employee's statement, the agency should have to show at least that the employee was negligent in not knowing of the extrinsic facts making the statement harmful to the agency's reputation. No such showing has been made here. Although it has had opportunity to do so, the government has presented no evidence of Gordon's awareness of any third-class mail regulations or of his duty to be aware of them. Plaintiffs have introduced evidence that the regulations are not published in the Postal Service's employee manual and are not posted or otherwise readily accessible to employees.

Accordingly, the defendant's motion for summary judgment is denied, and plaintiffs' cross-motion for summary judgment is granted. The case will proceed to trial on the only remaining issue: whether the protected speech was a substantial or motivating factor in the discharge.

---

**17.** This is not to say that the Postal Service cannot properly discipline an employee found to have read or disclosed the contents of any class of mail. That issue is not before the Court.